UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN D'AGOSTINO, et al., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> GOVERNOR DEVAL PATRICK, in his ) <br> official capacity as Governor of the ) <br> Commonwealth of Massachusetts; ) <br> THOMAS L. WEBER, in his official ) <br> capacity as the Commissioner of the ) <br> Department of Early Education and Care; ) <br> and SERVICE EMPLOYEES ) <br> INTERNATIONAL UNION, LOCAL 509, ) <br> ) <br> Defendants. ) | Case No. 1:14-CV-11866-LTS <br><br> **Oral Argument Requested** |

**MEMORANDUM OF STATE DEFENDANTS IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Deval Patrick, in his official capacity as Governor of the Commonwealth of Massachusetts, and Thomas L. Weber, in his official capacity as Commissioner of the Department of Early Education and Care ("EEC") (collectively, the "State Defendants") respectfully submit this Memorandum in Support of Motion to Dismiss the Amended Complaint.

**INTRODUCTION**

In August 2012, Governor Patrick signed into law 2012 Mass. Acts c. 189 (the "Act"), which extended collective bargaining rights to child care providers who provide care in their own homes to low-income or at-risk children and receive payment from the state. The Act declares such providers to be "public employees" for purposes of the state's public-sector labor relations

law, and thereby applies the provisions of the law to them.  The providers are not required to join the union or pay any compulsory fees.  But, as with any other public or private employee covered by the state's labor laws, the providers are represented during contract negotiations with the state by a union representative selected by a majority of bargaining-unit members.  In November 2012, Defendant Service Employees International Union, Local 509 ("SEIU") was selected as the exclusive representative for family child care providers, pursuant to the Act.

Plaintiffs object to representation by SEIU and, thus, are not members.  Nevertheless, they seek to invalidate the provisions in the Act that reflect the long-established principle that a labor union winning the majority support of employees in a bargaining unit has the right—and duty—to serve as the "exclusive representative" for all employees.  Plaintiffs argue that the mere fact of exclusive representation by the union for collective bargaining purposes—without any requirement to join the union or pay for any of its activities—"forces" them, in violation of the First Amendment, to associate with the positions taken by the union.  But this theory was rejected by the Supreme Court in Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271 (1984), which held that a state law permitting a teachers' union to serve as exclusive representative for the purpose of negotiating with the public employer did not implicate First Amendment rights; the Court held that the state had not restrained the teachers' "freedom to speak . . . or their freedom to associate or not to associate with whom they please, including the exclusive representative." Id. at 288 .  In Harris v. Quinn, -- U.S.  --, 134 S. Ct. 2618 (2014), the Supreme Court declined to uphold compulsory union fees imposed on those who were not "full-fledged public employees."  But Harris did not address—and casts no doubt on—the constitutionality of exclusive representation as affirmed in Knight.  Because the Knight decision governs this case, this Court should dismiss the Amended Complaint for failure to state a claim.

## STATUTORY BACKGROUND

    A.    <u>Family Child Care Services</u>

EEC was created on July 1, 2005 to combine the functions of the former Office of Child Care Services and the Early Learning Services Division of the former Massachusetts Department of Education.  <u>See</u> 2004 Mass. Acts c. 205 (enacting Mass. Gen L. c. 15D and creating EEC); <u>see also</u> 2008 Mass. Acts c. 215, §§ 21-36, 43 (repealing powers of EEC's predecessor).  EEC's enabling statute articulates "the policy of the Commonwealth to assure every child a fair and full opportunity to reach his full potential by providing and encouraging services which maximize a child's capacity and opportunity to learn."  Mass. Gen. L. c. 15D, § 1.  As the "lead agency of the commonwealth for administering and providing early education and care programs and services," <u>id.</u>, § 2(a), EEC licenses various types of child care centers and programs, <u>id.</u>, § 2(c); maintains a wait list and rate structure for providers of subsidized child care on behalf of low-income and at-risk children, <u>id.</u>, §§ 2(d)-(e); provides technical assistance, including training and professional development, <u>id.</u>, §§ 2(o)-(p); and "work[s] cooperatively with family child care providers to build upon the existing system and continuously improve the delivery of high quality [] services . . . through providers who have the requisite skills and training," <u>id.</u>, § 2(u).

Among the services regulated by EEC are those provided in a "[f]amily child care home," which is defined as a "private residence which, on a regular basis, receives for temporary custody and care during part or all of the day, children under 7 years of age, or children under 16 years of age if those children have special needs, and receives for temporary custody and care for a limited number of hours children of school age under regulations adopted by [EEC]."  <u>Id.</u>, § 1A.  The maximum number of children who may be served in such homes is six to ten.  <u>See id.</u> (defining "family child care home" and "large family child care home").

3

EEC pays to enable low-income and at-risk families to obtain child care, including by serving as the lead agency for administering the federal "Child Care Development Fund." See Mass. Gen. L. c. 15D, §§ 2(d)-(e); 606 C.M.R. 10.00 et seq.; see also 42 U.S.C. § 9858b; 45 C.F.R. § 98.11. EEC makes such payments to any licensed child care educator or provider with whom EEC contracts to provide care, or who has a voucher agreement with a child care resource and referral agency. See 606 C.M.R. 10.11(1). EEC also pays certain individuals exempt from licensure. Id. 10.11(2).

B. Recognition of Collective Bargaining Rights

On August 1, 2012, the Governor signed the Act into law, thereby extending collective bargaining rights to family child care providers. The Act defines a "[f]amily child care provider" as a "person who provides family child care services on behalf of low-income and other at-risk children and receives payment from the commonwealth for such services under a rate structure for voucher and contracted payments." Mass. Gen. L. c. 15D, § 17(a). In turn, "[f]amily child care services" are defined as "child care services provided for less than 24 hours per day in the residence of the provider on behalf of low-income and other at-risk children [for which payment is made by the commonwealth]." Id.

Section 17(b) of Chapter 15D provides that "[f]amily child care providers shall be considered public employees, as defined by and solely for the purposes of, [inter alia,] chapter 150E." In turn, Chapter 150E (originally enacted in 1973 Mass. Acts c. 1078, § 2), provides that public employees "shall have the right of self-organization and the right to form, join, or assist any employee organization, . . . [or] to refrain from any or all of such activities." Id., § 2. It also provides that an employee organization may be "designated by the majority of the employees in an appropriate bargaining unit as the exclusive representative of all the employees in such unit"

4

for collective bargaining. Id., § 4. And, it imposes a duty on the public employer to negotiate with the exclusive representative over the terms and conditions of employment. Id., § 6.

## FACTUAL BACKGROUND

Plaintiffs are child care providers offering care in their own homes (with the exception of Plaintiff Kozlowski-Heck, who assists others who do so). Am. Compl., ¶¶ 1, 9. With the exception of Plaintiff D'Agostino, Plaintiffs allege that they were providing services to one or more families eligible for subsidies, as of the date of the Amended Complaint. Id., ¶ 14.

On November 7, 2012, SEIU was certified by a majority vote of bargaining-unit members as the exclusive bargaining representative of family child care providers. See id., ¶ 23 & Exhibit ("Ex.") 1 at 2 (collective bargaining agreement ("CBA"), noting certification of union and recognition by EEC). EEC and SEIU subsequently entered into a CBA, covering a period ending June 30, 2016. Id., ¶ 24 & Ex. 1.

Prior to July 2014, EEC and SEIU agreed that certain "service fees" would be required as a condition of employment for family child care providers who object to, and, therefore, decline union membership. Id., Ex. 1, art. IX, § 17(1). Following Harris v. Quinn, -- U.S. --, 134 S. Ct. 2618 (2014), EEC and SEIU executed a Memorandum of Understanding ("MOU"), providing that no deductions for "service fees" would be made from compensation paid to family child care providers who have not chosen to pay union dues. See Am. Compl., ¶¶ 28-30. Plaintiffs subsequently amended the original complaint to withdraw their challenge to such fees. Id., ¶ 30.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Brockton Power LLC v. City of Brockton, 948 F. Supp. 2d 48, 63 (D. Mass. 2013) (quoting Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Where a party challenges the constitutionality of a statute on its face, and further factual development is immaterial to dispositive legal issues, a complaint may be dismissed for failure to state a claim under Rule 12(b)(6)." Brown v. Dep't of Veterans Affairs, 451 F. Supp. 2d 273, 277 (D. Mass. 2006); see also Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 252-55 (1st Cir. 2010) (affirming dismissal under Rule 12(b)(6) based on dispositive legal issues).

### I. THE ACT DOES NOT IMPLICATE THE FIRST AMENDMENT SPEECH OR ASSOCIATIONAL RIGHTS OF PLAINTIFFS BY REQUIRING THE STATE TO DEAL EXCLUSIVELY WITH A REPRESENTATIVE CHOSEN BY A MAJORITY OF PROVIDERS FOR COLLECTIVE BARGAINING PURPOSES.

The Supreme Court has recognized a "constitutionally protected 'freedom of association' in two distinct senses." Roberts v. United State Jaycees, 468 U.S. 609, 617 (1984). One line of cases (not applicable here) concerns "choices to enter into and maintain certain intimate human relationships." Id. The other involves the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Id. at 618; see also NAACP v. Alabama, 357 U.S. 449, 460-66 (1958) (requirement to disclose member lists infringes on right of association).

Plaintiffs argue that the mere fact that the Act allows exclusive representation in collective bargaining, without requiring anyone to join the union or pay any compulsory fees, forces the dissenting family child care providers to "associate" with the positions taken by the union, in violation of the First Amendment. But the Supreme Court in Knight rejected this theory, and declined to recognize the existence of any First Amendment interests of dissenters in this context. And, the Court's Harris decision—which concerned only compulsory fees—does not cast doubt on that holding. Thus, the Amended Complaint should be dismissed.

A. Under <u>Knight</u>, the Act Does Not Implicate First Amendment Rights Because It Does Not Force the Dissenting Providers to Affiliate with the Union and the Dissenting Providers Lack a Constitutional Right to Compel the Government to Negotiate With Them Directly.

In <u>Minnesota State Board for Community Colleges v. Knight</u>, 465 U.S. 271 (1984), the Supreme Court rejected the theory posited by Plaintiffs that a system of exclusive representation by a union representative violates the dissenting employees' First Amendment rights of association and speech. In that case, community college instructors who chose not to join the union sought to challenge the union's right of exclusive representation in two contexts: (i) a "meet and negotiate" process requiring the public employer to negotiate with the union with regard to "terms and conditions of employment"—<u>i.e.</u>, the traditional subjects of "mandatory" collective bargaining; and (ii) a "meet and confer" process requiring the employer to confer with the union on "employment-related questions not subject to mandatory bargaining." <u>Id.</u> at 274.

In an earlier decision, <u>Knight v. Minnesota Community College Faculty Association</u>, 460 U.S. 1048 (1982), the Supreme Court summarily affirmed the portion of the lower court's decision upholding the constitutionality of exclusive representation against a First Amendment challenge, as applied to traditional subjects of mandatory bargaining. <u>See</u> <u>Knight</u>, 571 F. Supp. 1, 3-7 (D. Minn. 1982); <u>see</u> <u>also</u> <u>Knight</u>, 465 U.S. at 279 (explaining that the summary affirmance "rejected the constitutional attack on [the Minnesota statute's] restriction to the exclusive representative of participation in the 'meet and negotiate' process'"); <u>id.</u> at 315-16 (Stevens, J., dissenting) ("[i]t is now settled law that a public employer may negotiate only with the elected representative of its employees . . . [with regard to] statutorily mandated subjects of collective bargaining"). As to the "meet and confer" process, the Court issued a full opinion, holding that exclusive representation in that context <u>also</u> failed to implicate First Amendment associational or speech rights because "[t]he Constitution does not grant to members of the

7

public generally a right to be heard by public bodies making decisions of policy." Knight, 465 U.S. at 283. By limiting participation in "'meet and confer" sessions to the exclusive representative, the state had "simply restricted the class of persons to whom it will listen in its making of policy." Id. at 282. The Court found that the instructors had "no constitutional right to force the government to listen to their views," id. at 283, and, thus, the state had not restrained the instructors' "freedom to speak . . . or their freedom to associate or not to associate with whom they please, including the exclusive representative," id. at 288.[1]

In the present case, Plaintiffs raise claims only with respect to a "meet and negotiate" process under Massachusetts law like the one summarily upheld in Knight, 460 U.S. 1048 (1982). Namely, Plaintiffs challenge the constitutionality of the Act, which permits a majority of family child care providers to elect an exclusive representative for collective bargaining under the state's public labor relations law. See Mass. Gen. L. c. 15D, § 17(b) (enacted by the Act, declaring family child care providers to be "public employees" for "purposes of[] chapter 150E"). Chapter 150E requires public employers to "meet . . . and [] negotiate in good faith [with the representative] with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment," id., § 6; it does not contain any requirement to "meet and confer" on any issues other than the traditional subjects of mandatory collective bargaining.[2] Compare Minn. Stat. § 179A.07(2) (upheld in Knight, 571 F.

---

[1] In so holding, the Court relied on Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 464-66 (1979), which found the "converse" of Knight, 465 U.S. at 286—namely, that an employer does not infringe First Amendment rights by dealing with individual employees, and not with the union, with respect to workplace grievances.

[2] While Mass. Gen. L. c. 15D, §§ 17(g)-(h) further define certain "mandatory subjects" of bargaining between EEC and family child care providers—including "education and training opportunities," "recruitment and retention of qualified providers," and the "rate structure for voucher and contracted payments" to providers—these topics do not expand the scope of

Supp. at 3 & n.2) (requiring employer to "meet and negotiate" over "terms and conditions of employment"). Thus, Plaintiffs' claims are foreclosed by the Supreme Court's summary affirmance of the "meet and negotiate" process in Knight.³

But even under the reasoning of the Court's full decision in Knight, 465 U.S. 271 (1984), the Act merely requires EEC to deal exclusively with the chosen representative of the bargaining unit for collective bargaining purposes. Thus, as in Knight, the state has only "restricted the class of persons to whom it will listen" in this context. Id. at 282; see also id. at 286 ("all that the [public employer] has done in its challenged conduct is simply to ignore the [dissenters][;] [t]hat it is free to do") (quoting Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 466 (1979)). The state has not imposed any restriction on the dissenting providers' ability to speak to EEC (nor do Plaintiffs make any such allegation), and the state does not force dissenters to affiliate with the union's positions. Indeed, as the Knight Court acknowledged, the state conducts negotiations with the exclusive representative with the understanding that not all bargaining-unit members may agree with the "official [] view" presented by that representative. Id., 465 U.S. at 276; see also Emporium Capwell Co. v. Western Addition Cmty. Org., 420 U.S.

---

bargaining beyond the traditional subjects listed in Chapter 150E. Compare City of Lynn v. Labor Relations Comm'n, 43 Mass. App. Ct. 172, 178, 681 N.E.2d 1234, 1238 (Mass. App. Ct. 1997) (stating that, in most cases, subjects deemed excluded from mandatory bargaining under c. 150E are reserved, by statute or tradition, to the "sole discretion of the public employer so as to preserve the intended role of the governmental agency") with Mass. Gen. L. c. 15D, § 2(u) (specifically authorizing EEC to "work[] cooperatively" with family child care providers to improve quality of services "through providers who have the requisite skills and training").

³ That decision, which arose from an appeal of a three-judge district court ruling under 28 U.S.C. § 1253, is binding authority on this Court. See Hicks v. Miranda, 422 U.S. 332, 344 (1975) ("(v)otes to affirm summarily . . . are votes on the merits of a case" in cases arising from Court's appellate jurisdiction) (citation omitted).

50, 62 (1975) (under federal labor law, the "complete satisfaction of all who are represented [by the exclusive representative] is hardly to be expected") (citation omitted).[4]

Though Plaintiffs assert that they are "forced to accept" (Am. Compl., ¶ 26) an exclusive representative for purposes of negotiating with the state, the Act imposes no such burdens on dissenting family day care providers. Namely, all providers can participate in the process to select the exclusive representative, and those, such as Plaintiffs, who are unhappy with the selected representative have no obligation to join the union. See Mass. Gen. L. c. 150E, § 2 (employees "shall have the right of self-organization . . . [or] to refrain from any or all of such activities") (emphasis added); id., § 4 (outlining procedures for selection of exclusive representative by bargaining-unit members); see also Mass. Gen. L. c. 15D, § 17(b) (extending these provisions to family child care providers). And, as a result of a voluntary agreement between EEC and SEIU, dissenting providers now have no obligation to pay any compulsory fees to fund union activities. See Am. Compl., ¶ 30 (acknowledging that Plaintiffs have withdrawn any challenge to such fees). Individual providers thus remain free to disassociate themselves from the union by communicating with EEC on their own, with whatever association they choose, and with regard to any issue, policy-related or otherwise. Indeed, the Supreme Court has acknowledged that dissenting bargaining-unit members are free, in this way, to engage in their own speech to oppose the union. See Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 521 (1991) ("[dissenting] employees are free to petition their neighbors and government in opposition to the union which represents them in the workplace"); City of Madison, Joint Sch.

---

[4] Plaintiffs also make no claim that the state has prevented access to any public forum, or that any government property has been closed to them for the purpose of engaging in speech. See Knight, 465 U.S. at 281-82; compare City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 176 (1976) (holding that dissenting employees must be permitted to attend public hearing).

Dist. No. 8 v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 176 n.10 (1976) ("no one would question the absolute right of the nonunion [employees] to consult among themselves, hold meetings, reduce their views to writing, and communicate those views to the public generally . . . [or] directly to the [government]").[5]

Plaintiffs may also argue that the "unique status" of the exclusive representative in the bargaining process may "amplify[y] its voice" (as compared to the competing voices of individual dissenters), thereby creating "pressure" on dissenting employees to join the union. Knight, 465 U.S. at 288-89. But, even if such indirect pressure existed (which the State Defendants do not concede), this would fail to raise any First Amendment concerns. Id. (rejecting this theory as basis for finding violation of dissenters' associational rights); see also Smith, 441 U.S. at 465-66 (claim that exclusive dealing with individual employees could impair effectiveness of union fails to implicate union's associational rights). The fact that dissenters exist, or that they may disagree with positions taken by their chosen representatives, is hardly surprising, and is "inherent in our system of government"; however, this "does not create an unconstitutional inhibition on associational freedom." Knight, 465 U.S. at 290.

---

[5] In other contexts, the Supreme Court has also rejected First Amendment claims, where the alleged burden on speech and associational rights does not interfere with the message that the plaintiff wishes to express. Similarly, here, the state has done nothing to require affiliation with any positions taken by the union, or to interfere with the dissenters' own message. See, e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 65 (2006) (rejecting law school's claim that requiring it to give campus access to military recruiters interfered with its message, where "[n]othing about recruiting suggests that law schools agree with any speech by recruiters"); see also Catherine L. Fisk and Erwin Chemerinsky, "Political Speech and Association Rights After Knox v. SEIU Local 1000," 98 Cornell L. Rev. 1023, 1063 (2013) (noting that, even in cases where Supreme Court has protected the expressive activities of organizations—e.g., Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000) (permitting Boy Scouts to exclude gay-and-lesbian-rights activist as member)—the Court "gave no weight to the rights of dissenting members" who may have wanted to convey a different message).

B. <u>Plaintiffs' Claim that the Imposition of a Fiduciary Duty on the Union Infringes Their Associational Rights as Beneficiaries Lacks Any Legal Support.</u>

Plaintiffs also allege that "[e]xclusive representation is a fiduciary relationship," and that certification of SEIU as exclusive representative "will thrust Plaintiffs and all other family child care providers into a mandatory fiduciary relationship with their designated representative, and affiliate them with its petitioning, speech, and policy positions." Am. Compl., ¶ 22. But, this curious argument—which appears to dispute the union's duty to <u>protect</u> the rights of dissenting bargaining-unit members—mounts a challenge to a separate legal doctrine (the duty of fair representation) that is distinct from the right of exclusive representation at issue here. Under federal law, this duty has been implied from the statutory right of exclusive representation established by the National Labor Relations Act of 1935 ("NLRA"). <u>See</u> <u>Vaca v. Sipes</u>, 386 U.S. 171, 177 (1967). Massachusetts law makes the duty explicit by statute. <u>See</u> Mass. Gen. L. c. 150E, § 5; <u>Collective Bargaining Reform Ass'n v. Labor Relations Comm'n</u>, 436 Mass. 197, 207 n.12, 763 N.E.2d 1036, 1044 n.12 (Mass. 2002).

As an initial matter, a union's duty of fair representation is not equivalent to a "fiduciary duty" under state law, which determines such duties on a case-by-case basis based on the "relationship between the parties and the nature of their agreement." <u>Ravosa v. Zais</u>, 40 Mass. App. Ct. 47, 51 n.7, 661 N.E.2d 111, 115 n.7 (Mass. App. Ct. 1996); <u>see</u> also <u>N.L.R.B. v. Local 299, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.</u>, 782 F.2d 46, 51 (6th Cir.1986) (union's duty of fair representation under NLRA does not "include an undefined fiduciary duty which a union owes to its unit as a whole"). But, even if a fiduciary duty could be inferred, the State Defendants are aware of no caselaw suggesting that the existence of such a duty, in and of itself, could infringe the associational rights of beneficiaries. Indeed, such a ruling could invalidate a host of unrelated laws, simply because the beneficiary disagrees with

12

the selection of the fiduciary. See, e.g., Mass. Gen. L. c. 35, § 10 (imposing fiduciary duty on county treasurer to invest retirement funds in prudent manner); Mass. Gen. L. c. 156B, § 13(b)(1½) (restricting corporation's ability to limit fiduciary duties of directors); Mass. Gen. L. c. 190B, § 3-712 (creating liability for breach of fiduciary duty by representative of estate).

      C.      The Harris Decision Does Not Cast Doubt on the Constitutionality of Exclusive Representation as Affirmed in Knight.

Contrary to Plaintiffs' suggestion, see Am. Compl., ¶¶ 29-30, Harris v. Quinn, -- U.S. --, 134 S. Ct. 2618 (2014), does not cast doubt on the constitutionality of exclusive representation as affirmed in Knight. The Harris case dealt solely with the question whether compulsory financial support of a union through an "agency-fee provision," under which dissenting employees who do not wish to join the union must nevertheless pay a fee to the union, infringed the First Amendment rights of dissenters. Id, 134 S. Ct. at 2625. In finding such infringement, the Court declined to extend its prior ruling in Abood v. Detroit Board of Education, 431 U.S. 209 (1977), which approved the agency-fee provision in the context of public employees, to cover those who are not "full-fledged public employees" (there, in-home "personal assistants" providing Medicaid-reimbursed services) and whom the state deemed to be employees solely for collective bargaining purposes. See Harris, 134 S. Ct. 2623, 2636-38. The Court concluded that the state's interests in promoting labor peace and improving the personal-assistant program were insufficient to satisfy the compelling interest/narrow tailoring test, which the Court found applicable where compulsory fees were involved. Id. at 2639-41.

But whatever the merits of the Harris decision, it has no relevance to the issues presented here. As the Harris Court itself made clear, the dissenting employees in that case did not "challenge the authority of the [union] to serve as the exclusive representative of all the personal assistants in bargaining with the State"; instead, "[a]ll they s[ought] is the right not to be forced

13

to contribute to the union, with which they broadly disagree." Id. at 2640.  The Court noted that "[a] union's status as exclusive bargaining agent and the right to collect an agency fee from non-members are not inextricably linked," and found the state's justifications lacking only in the context of agency fees.  Id.  Thus, because Harris dealt only with the issue of compulsory union fees—and because Plaintiffs have withdrawn their challenge to any such fees in light of the MOU signed by EEC and SEIU, see Am. Compl., ¶ 30—Harris has no application here.

> D.    To the Extent Plaintiffs Challenge the Act's Authorization of Collective Bargaining Altogether for Family Child Care Providers, this Court Should Reject this Claim Based on a Rational Basis Standard of Review.

Because plaintiffs cannot demonstrate that the Act infringes their speech or associational rights, their claim boils down to an apparent attempt to eliminate the right of collective bargaining altogether for family child care providers.  Indeed, the principle of exclusive representation has long roots in both federal and state labor law, and has been construed to be part and parcel of the right of collective bargaining.  See Emporium, 420 U.S. at 62 ("[c]entral to the policy of fostering collective bargaining, where the employees elect that course, is the principle of majority rule"); SEIU Local 509 v. Labor Relations Comm'n, 431 Mass. 710, 715, 729 N.E.2d 1100, 1104 (Mass. 2000) (right of exclusive representation is a "basic building block of [the state's] labor law policy").

Where the right of collective bargaining—and attendant right of exclusive representation—have been challenged as infringing constitutional rights, the Supreme Court has upheld such rights as a valid form of economic legislation.  As early as 1937, the Court in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937), rejected a due process challenge to the NLRA as violating the employer's "right to conduct its business in an orderly manner without being subjected to arbitrary restraints."  Id. at 43.  And, more recent cases have confirmed that

14

collective bargaining rights are ultimately "conferred by statute rather than the Federal Constitution." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 313 (1979); see also Smith, 441 U.S. at 464 (the "First Amendment is not a substitute for the national labor relations law"). This means that both the right to form unions, and the right not to, is subject to reasonable policy choices. See, e.g., Laborers Local 235 v. Walker, 749 F.3d 628, 634-40 (7th Cir. 2014) (upholding restrictions on public-sector collective bargaining based on "highly deferential" rational-basis test, and rejecting First Amendment claims).

In turn, the Supreme Judicial Court has acknowledged that the Massachusetts Legislature "drew considerable guidance from the [NLRA], when it drafted [] c. 150E." Mass. Org. of State Engineers & Scientists v. Labor Relations Comm'n, 389 Mass. 920, 928, 452 N.E.2d 1117, 1122 (Mass.1983); see also Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 562 n.2, 428 N.E.2d 124, 126 n.2 (Mass. 1981). And, it has construed the "avowed purpose" of Chapter 150E as "'promot[ing] harmonious and cooperative relationships between government and its employees' by encouraging public employers and employees to agree upon procedures for resolving disputes." Boston Teachers Union, Local 66 v. City of Boston, 382 Mass. 553, 564 & n.12, 416 N.E.2d 1363, 1370-71 & n.12 (Mass. 1981) (citing legislative history to c. 150E).

Because the principle of exclusive representation fails to implicate First Amendment rights, the state "need not demonstrate any special justification" for its extension of collective bargaining rights to family child care providers through the Act. Univ. of Pennsylvania v. E.E.O.C., 493 U.S. 182, 201 (1990) (upholding EEOC subpoena process without special justification, where university failed to demonstrate any burden on First Amendment rights in context of compelled disclosure of peer review materials); see also Knight, 465 U.S. at 291 (where exclusive representation posed no First Amendment problems, rejecting alternative

equal-protection theory on the ground that state's interest in dealing with one representative during employment-related discussions satisfied rational-basis test). The legislation here clearly has a rational basis, as it seeks to improve the quality of child care services for low-income and at-risk families by creating cooperative relationships with those whom the state reimburses for providing such services. See, e.g., Sept. 12, 2012 Press Release, "Governor Patrick Signs Legislation Giving Family Child Care Providers Resources to Deliver High Quality Educational Opportunities for Our Young Citizens," available at http://www.mass.gov/governor/pressoffice/pressreleases/july-december-2012-press-releases.html (last accessed Sept. 26, 2014).

The Act also reflects a reasonable policy choice to expand the scope of coverage of the state's labor laws. Legislative bodies have wide discretion in making such choices. See, e.g., NLRB v. Hearst Publications Inc., 322 U.S. 111, 124-30 (1944) (holding that "newsboys" were covered by NLRA in light of legislative goals, even though they did not fit traditional definition of "employee") (superseded by later amendment to NLRA to exclude "independent contractors"); Mass. Probation Ass'n v. Comm'r of Admin., 370 Mass. 651, 658-63, 352 N.E.2d 684, 688-91 (Mass. 1976) (reviewing legislative history of Chapter 150E to determine scope of coverage); see also Benjamin I. Sachs, "Labor Law Renewal," 1 Harv. L. & Pol'y Rev. 375, 382-87 (2007) (noting trend among states to extend collective bargaining rights to "atypical" workers, such as family child care providers, to fill gaps created by exclusions from NLRA coverage). Accordingly, the Act's authorization of collective bargaining for family child care providers through their chosen exclusive representative meets the rational-basis standard of review.

### III. THIS COURT SHOULD DISMISS ANY CLAIMS FOR MONEY DAMAGES AGAINST THE STATE DEFENDANTS.

While the State Defendants seek a full dismissal of this action, this Court, if it permits the case to proceed, should dismiss any claims for money damages against the State Defendants. It

is well-settled that a "suit against a state official in his or her official capacity . . . is no different from a suit against the State itself," and thus is barred by Eleventh Amendment sovereign immunity.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); accord Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993).  While an official-capacity suit may seek "prospective injunctive relief against state officials," with respect to a continuing violation of federal law, Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 96 (1984) (citing Ex parte Young, 209 U.S. 123 (1908)), money damages are unavailable, see O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000).  Thus, the portion of the Amended Complaint seeking damages against the State Defendants should be dismissed.  See Am. Compl. at 10.

## CONCLUSION

Based on the foregoing, the State Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.

        Respectfully submitted,
        GOVERNOR DEVAL PATRICK, in his official capacity as Governor of the Commonwealth of Massachusetts, and THOMAS L. WEBER, in his official capacity as the Commissioner of the Department of Early Education and Care,

*By their attorney*,
MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Tori T. Kim
Tori T. Kim, BBO #651721
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts  02108
Tel:  (617) 963-2022
Fax: (617) 727-5785
Email:  tori.kim@state.ma.us

Dated:  September 26, 2014

## **LOCAL RULE 7.1 STATEMENT**

I certify that I have conferred with opposing counsel, Attorney William L. Messenger, regarding this motion, but was unable to resolve or narrow the issues presented in the motion.

                                                                                   __/s/ Tori T. Kim_____
                                                                                       Tori T. Kim

## **CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on today's date.

                                                                                  __/s/ Tori T. Kim_____
                                                                                       Tori T. Kim